Spring Garden Building and Loan Association *v.*
Rhodes, Trustee, Appellant.

Argued November 16, 1936.

Before KELLER, P. J., CUN-
NINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and
RHODES, JJ.

*John E. McDonough,* with him *R. P. Lessy* and
*Joseph E. Pappano,* for appellant.

*Martin F. Hatch,* with him *Charles F. Eggleston,* for
appellee.

OPINION BY PARKER, J., February 26, 1937:

This is an appeal from an order of a court of com-
mon pleas refusing to open a judgment entered by con-
fession on a warrant of attorney. We are all of the
opinion that the evidence produced on a rule to show
cause why the judgment should not be opened was
sufficient to require the making of the rule absolute.

Richard Purdy was the owner of a parcel of land
in the borough of Darby, Delaware County, and de-

sired to consummate a sale of the premises to Arlington H. Templin and Cassie A. Templin, his wife. The solicitor for the plaintiff testified that in June, 1928, Purdy asked him for a loan from the plaintiff on the premises in question to assist in financing the proposed sale. A loan was made at that time but the evidence is not as clear as would be desirable as to whether the loan was made to Purdy, to the Templins, or to all three. However, a loan was actually made and the Templins and Purdy executed and delivered their bond to plaintiff in the sum of $3,000, conditioned for the payment of the just sum of $1,500 with interest at six per cent, payable monthly, together with all fines imposed, a monthly premium bid for the loan, and monthly dues of eight dollars on eight shares of installment stock pledged as security for the loan. A mortgage on the premises was executed by the Templins alone, eight shares of installment stock issued in the 55th series of the plaintiff company to the Templins were assigned to plaintiff, and both the mortgage and stock became collateral security for the payment of the loan. The bond recited the mortgage and assignment of stock. When the loan was closed the premises were conveyed by Purdy to the Templins and a first mortgage to a third party to secure the sum of $3,000 was filed, followed by the mortgage to the building and loan association for $1,500 and then by a judgment in favor of Purdy against the Templins. In that manner the sale was financed with the knowledge of the solicitor for plaintiff at the time the loan was closed.

In 1931, the Templins became in arrears and defaulted in their payments on the first mortgage to plaintiff, when by virtue of a written agreement between the association and Arlington H. Templin (not signed by his wife) the association made what they described as a "reset". The shares in the 55th series were cancelled and their net value was credited on the

principal obligation, thereby reducing it to $1,450. Eight new shares in the 61st series were issued to the Templins and substituted for those in the 55th series, thus making a substantial change in the original contract signed by Purdy and all without the knowledge of Purdy.

The court below found as a fact that the loan in question was made to Richard Purdy. We are by no means certain that such finding was warranted by the evidence. The only evidence given in support of that conclusion is the testimony of the solicitor to the effect that Purdy applied to him for a loan from the association and that the association agreed to make the loan provided Purdy "became joint obligor in the bond, as he was getting all the money." In his deposition he further testified: "He was selling the property and this money was going to him." As against this testimony it appeared that Purdy was not a stockholder; the stock was issued to the Templins; the mortgage was not a so-called "straight loan", but was a typical loan and mortgage to a member by a building and loan association. The bond shows the loan was made subject to the payment of a premium in addition to six per cent interest. By §37, cl. 4, of the Act of April 29, 1874, P. L. 73 (15 PS 951), such associations were authorized to offer funds for loan in open meeting to the stockholder who bid the highest premium for preference or priority of loan, and by the Act of June 4, 1901, P. L. 403, §1 (15 PS 952), stockholders or prospective stockholders were authorized to make their bids in writing. Unless the association so proceeded it was not conducting a legitimate building and loan association business but was attempting to evade the usury laws: *Klein v. Penna. Savings F. & L. Assn.*, 216 Pa. 516, 522, 65 A. 1103. In the face of these facts and the law the evidence was, to say the least, very meager support for the conclusion that the loan

was made to Purdy. On the trial of the case it should be possible to produce the records of the association showing who in fact made the bid for the loan. This evidence would be of prime importance in determining to whom the loan was actually made, as well as the relation which Purdy bore to the transaction.

Now if Purdy was a surety, it is well settled that the cancellation of the stock in the 55th series and a re-issue in the 61st series without the assent of Purdy relieved him from liability on the bond, unless other reason appeared for holding otherwise. There was not any testimony showing that Purdy knew of the so-called reset or assented to the change. "A surety has the right to stand upon the very terms of his obligation and is bound no further," and any material alteration of a contract by the principal parties without the surety's assent is fatal to its validity as against the surety: *Jacob Sall B. & L. Assn. v. Heller,* 314 Pa. 237, 242, 171 A. 464. In that case, as here, the change relied upon was a cancellation of stock and the issuing of stock in a later series.

It is not necessary at this time to decide whether Purdy was a surety as to the building and loan association. He signed the bond without indicating specifically that he was signing as surety. When the available evidence is produced the question presented may be a different one. The facts, however, clearly support the deduction that as between Purdy and the Templins, Purdy was only a surety even though he signed the bond as a principal obligor. Part of the consideration for the conveyance from Purdy to the Templins was represented by the amount borrowed from the plaintiff, and it was therefore a primary obligation of the Templins for which Purdy was only secondarily liable as between the obligors on the bond.

"The rule discharging a surety on an extension of time being given by the creditor to the debtor usually

applies to every case where at the time of the transaction the creditor has notice that the relation between the debtors is one of principal and surety ...... The same rule applies although at the time of the creation of the debt they may both have been interested in the consideration": 21 R. C. L. 1025. Also, see *Union Mutual Life Ins. Co. v. Hanford,* 143 U. S. 187, 12 S. Ct. 437, 438. If however the creditor, when he gives time to a principal debtor, is unaware that such relation exists, the surety is not discharged: *McCloskey v. Indianapolis Mfgr. & Carpenters' Union,* 67 Ind. 86, 33 Amer. Rep. 76; *Mullendore v. Wertz,* 75 Ind. 431, 39 Amer. Rep. 155; *Nichols v. Parsons,* 6 N. H. 30, 23 Amer. Dec. 706. Also see note 21 Eng. Rul. Cas. 662, and §120 of the Uniform Negotiable Instruments Act. The evidence showing that plaintiff knew the true relationship, it follows that the rule to open should be made absolute unless other reasons appear for holding otherwise.

The plaintiff did suggest one other ground in support of the position of the lower court to which we should refer. Plaintiff offered evidence tending to show that after the mortgage was foreclosed Purdy and the plaintiff entered into a verbal contract, ratified by resolution of the board of directors of the plaintiff, whereby Purdy paid $70 and agreed to pay $30 at once and $1,400 within three months in discharge of his obligation, and on the strength of that agreement the plaintiff released seven lots of Purdy's which were subject to the lien of the judgment entered. The plaintiff alleges that Purdy thereby estopped himself from setting up the defense which we have considered.

"It is ordinarily held that if a surety with knowledge of facts operating to discharge him from liability does any affirmative act which contemplates the continued existence of his status as a surety, he thereby waives the right to claim that he is discharged": 21 R. C. L.

1002. The facts shown, however, lack one of the principal essentials of estoppel for there is not any evidence in the record showing that Purdy had any knowledge of the fact that the stock in the 55th series had been cancelled and new stock in a later series issued in its place at the time, or prior to the time, that he negotiated for the release of the lots. Purdy denied that he did have such knowledge. If, on the trial of the case, evidence should be produced showing that Purdy acted with knowledge of the facts, a question will be presented for the jury. If the jury finds that Purdy knew of the change in stock as collateral at the time he agreed to settle the claim of the plaintiff, then plaintiff is entitled to a judgment.

As the parties have made their case, a situation is presented which clearly requires the opening of the judgment and a submission of the issues to a jury.

The order of the lower court discharging rule to show cause why the judgment should not be opened is reversed and it is directed that the rule be made absolute.